UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | CRIMINAL NO. 17- 65 (JDB) |
| | : | |
| Jean-Paul Gamarra, | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MOTION TO MEDICATE INVOLUNTARILY DEFENDANT TO RESTORE COMPETENCY

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully requests that the Court order the Bureau of Prisons ("BOP") to medicate involuntarily defendant Jean-Paul Gamarra ("Gamarra" or "defendant") to restore him to competency to allow him to stand trial. In support of its request, the government cites the following points and authorities, as well as any additional arguments and/or authorities that are proffered at a hearing on this motion.

### FACTUAL AND PROCEDURAL HISTORY

The defendant is a United States citizen with no clear fixed address. He does not work at the White House or its grounds in Washington, D.C., and he has no authorized business there. On March 28, 2017, at approximately 10:17 a.m., the defendant approached United States Secret Service ("USSS") law enforcement, who were armed, at 1500 Pennsylvania Avenue, NW, Washington, D.C., near the Treasury Department Building, and advised that he had a nuclear bomb detonator or defuser. The defendant was asked if he had a bomb with him and the defendant said no, he had a component to launch a nuclear weapon. The defendant said he was not there to harm President Trump. Law enforcement directed the defendant to place the

package he was carrying on the ground.  The package was a U.S. Postal Service Priority Mail Envelope that included on its cover (all spellings as they appear in the original) "Warning 100% threat Brand New Electronic Detonator Device president Secrete Servisce Explosive technology Department" and the statement "Warning this is a ~~tre~~ threat on the President and Senator life Secure Keyboard to be Reversed Engineereed." The outer package included the label "Blue tooth Bomb Explosion Component."

In reaction to the defendant's actions, at that time various parts of a several square block area were closed to pedestrian and vehicular traffic, including the north fence line of the White House and its grounds, Lafayette Park, half of the Ellipse, the south fence line, and 15th Street from New York Avenue to F Street.  For more than 90 minutes, no one was permitted to use the north entrance of the Department of Treasury Building.  No one was permitted to enter or exit the Department of Treasury Annex Building, or the Bank of America Building, located north of Pennsylvania Avenue, or the SunTrust bank building, located diagonally from the Department of Treasury Building.  These closures affected interstate commerce.  At approximately 11:57 a.m., the item in the bag, a Bluetooth keyboard, was rendered safe, and the streets and parks were reopened.  A note included with the keyboard included the statement (as written) "Warning this device is a threat on Senatar and President Life."

The defendant consented to an interview.  The defendant stated he had walked to the White House to deliver a "nuclear bomb component," which he wanted the USSS to have to avert a bomb-related plot against the President.  The defendant stated he intended to deliver the keyboard to the Secret Service to "reverse engineer" its capabilities and keep the President safe. The defendant said he did not have any explosives and wished no harm on the President.

The defendant was then arrested and charged by Complaint with Threats Against the President, in violation of 18 U.S.C. § 871, which carries a maximum penalty of five years of incarceration, and Threatening and Conveying False Information Concerning the Use of an Explosive, in violation of 18 U.S.C. 844(e), which carries a maximum penalty of 10 years of incarceration. On March 29, 2017, the government made a motion for a forensic screening and for temporary detention, pursuant to 18 U.S.C. § 3142(f)(1)(A) (crime of violence). Both motions were granted, and the parties agreed to hold a detention hearing and status on forensic screening on April 4, 2017.

On April 3, 2017, Dr. Teresa Grant conducted a preliminary competency screening examination for the D.C. Department of Behavioral Health, and found the defendant incompetent. On April 4, 2017, a grand jury indicted the defendant on the same charges as alleged in the Complaint. Magistrate Judge Deborah A. Robinson held an evidentiary hearing, and probable cause was found for the offenses.[1] The government requested that the defendant be committed to the Attorney General for a full 30 day psychological examination assessing whether the defendant was presently suffering from a mental disease or defect rendering him mentally incompetent. Judge Robinson permitted the commitment for placement in a suitable Bureau of Prisons ("BOP") facility for a period not to exceed thirty days. (ECF Doc. 5). The defendant was then transferred to Medical Correctional Center, New York, New York (MCC New York) for further screening, on April 24, 2017. On July 17, 2017, having reviewed the MCC New York Competency to Stand Trial Evaluation prepared by Dr. DiMisa, (MCC New York Report), Judge Robinson granted the motion by the Government to commit the defendant

---

[1] A copy of the transcript of this hearing is part of the Sell hearing record. (ECF Doc. 19). The exhibit list reads Transcript of 4/6/2017 Hearing, but the transcript is dated April 4, 2017. It is the government's understanding that the Court is aware of the error.

for placement in a suitable facility for 120 days to determine whether there was a substantial probability that he would in the foreseeable future attain the capacity to permit the proceedings to go forward.  (ECF Doc. 8).

On September 19, 2017, the defendant arrived at Federal Medical Center Butner ("FMC Butner"), and began treatment.  On January 12, 2018, Dr. Evan Du Bois and Psychology Intern Kelsey Laxton completed their report on the defendant.  ("FMC Butner Report").  On January 30, 2018, prior to the report being received by the Court, the government indicated hearing it would consider pursuing involuntary medication for the defendant once the FMC Butner Report was received.

The FMC Butner Report, received February 9, 2018, found the defendant not competent, and recommended involuntary medication.  On March 8, 2018, the Court set a hearing date on involuntary medication, pursuant to Sell v. United States, 539 U.S. 166 (2003), for April 9, 2018.[2]  After a short continuance by the defendant, the Court heard testimony from Kelsey Laxton and Dr. Evan DuBois on April 13, 2018.  Dr. Logan Graddy issued his own report on April 11, 2018 ("Graddy Report"), and the Court heard testimony from Dr. Graddy on April 13, 18, and 20, 2018.

## ARGUMENT

The issue before the court is whether the defendant, who is mentally ill, can be administered antipsychotic drugs against his will.  The Supreme Court held in Sell v. United States that under the Fifth Amendment Due Process Clause, it was permissible to involuntary medicate a mentally ill defendant facing serious criminal charges in order to render that

---

[2] On March 8, 2018, the defendant moved to dismiss the case for a violation of 18 U.S.C. § 4241 time limits imposed on Attorney General custody of the defendant.  That motion was denied on April 6, 2018, but the Court also ordered that the parties complete the Sell hearing by April 30, 2018.

defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary to significantly further important governmental trial-related interests.  539 U.S. at 179.  Specifically, the Supreme Court provided a four part analysis in determining the appropriateness of forced medication.

First, a court must find that important governmental interests are at stake.  Id. at 180.  Second, a court must conclude that involuntary medication will significantly further those state interests:  the court must conclude that the administration of the drugs is substantially likely to render the defendant competent to stand trial, and that the administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.  Id.  Third, the court must conclude that involuntary medication is necessary to further those interests, particularly that any alternative, less intrusive treatments are unlikely to achieve substantially the same results as involuntary medication.  Fourth, the administration of the drugs must be medically appropriate, "in the patient's best medical interest in light of his medical condition."  Id. at 180-181.  The government must offer clear and convincing evidence for the factual determinations necessary under Sell.  See United States v. Dillon, 738 F.3d 284, 291 (D.C. Cir. 2013).

**A.     Prosecution of this case involves an important governmental interest.**

The first prong of the Sell analysis is whether an important governmental interest is at stake.  Id. at 180.  The Supreme Court noted that the government's interest in bringing to trial an individual accused of a serious crime is important, regardless of whether the offense is a serious crime against a person or a serious crime against property.  Id.  In both instances the government

seeks to protect through application of criminal laws the basic need for security. Id (citing Riggins v. Nevada, 504 U.S. 127, 135-36 (1992) ("'[P]ower to bring an accused to trial is fundamental to a scheme of "ordered liberty" and prerequisite to social justice and peace'" (quoting Illinois v. Allen, 397 U.S. 337, 347 (1970) (Brennan, J., concurring))). There are important governmental interests at stake in this case. Any threat on a governmental official, particularly the President, is of significant concern to the government; and the government has a significant interest in bringing those offenders to justice. Failure to bring such offenders to justice has the potential to substantially undermine or interfere with the orderly process of government and thereby have a negative impact on the community as a whole. See United States v. Bush, 585 F.3d 806, 815 (4th Cir. 2009) (prosecution in threats case involving judge "conveys a message about its seriousness and its consequences").

In this case, the defendant through his threatening conduct caused a significant area of the District to be closed to traffic and commerce for approximately an hour and forty minutes. The threat itself and the reaction to it demonstrates the serious nature of the crimes committed in this case. In an earlier Sell case, Magistrate Judge Facciola, finding under Sell the seriousness of a threat by a mentally ill defendant envisioning a chlorine gas attack, noted "With hindsight of course, it is easy to say that defendant's crime amounted to nothing more than his putting a bizarre note next to a water bottle . . .when the threat has dissipated, it is easy to accuse government officials of an overreaction. But, until it dissipates, the impact on the community can be terrifying." United States v. Orloski, 554 F. Supp.2d 4 (2008). In addition, the government has a significant interest in getting the defendant the necessary treatment in order to limit his likelihood to reoffend.[3]

---

[3] The defendant's bizarre behavior in relation to public figures is further detailed in the

Threats Against the President, in violation of 18 U.S.C. § 871, carries a maximum penalty of five years of incarceration, and Threatening and Conveying False Information Concerning the Use of an Explosive, in violation of 18 U.S.C. 844(e), carries a maximum penalty of 10 years of incarceration. Pursuant to the United States Sentencing Guidelines ("USSG"), § 2A6.1, the defendant will likely have a Base Offense Level of 12, and an increase of four levels, see § 2A6.1 (b)(4)(A), or a guideline level of 16, or 21-27 months. The defendant has been incarcerated for approximately 13 months, but this length of time should not undermine the government's interest in prosecuting him. See United States v. Dillon, 943 F. Supp. 2d 30, 35-36 (D.D.C. 2013) (Bates, J.) (noting case law supporting that defendant's pre-trial custody was not so lengthy as to undercut government's interest); United States v. Aleksov, 2009 WL 1259080, at *1-2 (D.D.C. May 7, 2009) (pre-trial custody of sixteen months did not undermine the government's interest in prosecuting the defendant where guideline range was 10 to 33 months). See also Bush, 585 F.3d at 815 (noting importance of other post sentence supervision periods to which a defendant might be exposed regardless of time served in the case).

**B.      Forced medication will further government interest.**

The second prong of the Sell analysis is whether involuntary medication will significantly further the government's interests; that is, whether the administration of drugs is substantially likely to render the defendant competent to stand trial, and substantially unlikely to have side

---

January 12, 2018 FMC Butner Report ("FMC Butner Report"). The FMC Butner Report documents that he has filed law suits against various public figures including former President Barack Obama, presidential candidate Hillary Clinton, and former U.S. Attorney General Eric Holder. In an incident dated January 30, 2015, the defendant claimed to be part of a group impeaching then President Obama, and on July 7, 2016, the defendant went to the U.S. Capitol Visitor Center with the purpose of having a judge arrest candidate Clinton. Several months later, the defendant committed the instant offense. Near in time to the instant offense, the defendant also was detained, and later the subject of a warrant, for an unlawful entry at U.S. District Court, 17CMD5256 (D.C. Superior Court).

effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering a fair trial. Sell, 539 U.S. at 181.

As stated above, the defendant was evaluated at FMC Butner. After an observation and evaluation period of several months, Ms. Laxton and Dr. Du Bois issued the FMC Butner Report. Ms. Laxton, who had co-authored 10 court-ordered evaluations for competency to stand trial, and conducted more than 20 overall, was admitted as an expert in the field of clinical forensic psychology (4/13/18 Tr. at 10, 11, 13 (Laxton)), as was Dr. Du Bois (4/13/18 Tr. at 55 (Du Bois).[4] Ms. Laxton and Dr. Du Bois both contributed to the report, over which ultimately Du Bois had supervision. (4/13/18 Tr. at 60 (Du Bois)).

1. The defendant was found not competent.

As stated by the report, the medical team at FMC had numerous interactions with the defendant, conducted exams, gave the defendant tests, and had access to the defendant's extensive medical history. (FMC Butner Report at 2-4) (summarizing information obtained). The medical team met on various occasions with the defendant for both formal interviews, as well as informal contacts. (Id.; 4/13/18 Tr. at 15 (Laxton)). The medical team also collected and reviewed collateral sources, including mental health records from five separate places, as well as the MCC New York Report (FMC Butner Report at 2-3; 4/13/18 Tr. at 16-17 (Laxton)).

The medical team also administered various tests, instruments, or assessments (semi-structured interviews) to the defendant, including a Revised Competency Assessment Instrument, a Personality Assessment Inventory, and an Evaluation of Competency to Stand Trial, Revised. (4/13/18 Tr. at 17-18 (Laxton); FMC Butner Report at 2).

---

[4] The government will refer to the transcripts of the evidentiary hearing by ([Date (__/__/__)] Tr. at [Page number]).

Ms. Laxton and Dr. Du Bois determined that the defendant suffered from schizophrenia continuous, as well as a cannabis use disorder. (4/13/18 Tr. at 18 (Laxton) 58, 61-62 (Du Bois); FMC Butner Report at 8-10). Dr. Graddy concluded that the defendant suffers from schizophrenia, multiple episodes, currently in an active episode (Graddy Report at 1-2).[5] The defendant suffered particularly from disorganized speech and delusional ideation for the schizophrenia diagnosis. (4/13/18 Tr. at 19-20 (Laxton); 62-63 (Du Bois)). Dr. Graddy noted evidence of four key symptoms of the disorder: delusions, hallucinations, disorganized speech, and disorganized behavior. (Graddy Report at 1).

Ms. Laxton and Dr. Du Bois also reviewed whether the defendant was competent to stand trial, and determined the defendant was not. (FMC Butner Report at 10-14). Ms. Laxton and Dr. Du Bois examined the defendant's factual understanding of the case, his rational understanding of the case, his capacity to testify, his capacity to consult with counsel, and his capacity to exhibit appropriate courtroom behavior. A failure in any category would result in a finding of incompetency (4/13/18 Tr. at 29 (Laxton)); although the medical team found he understood the facts of his case despite his disorganized speech and difficulty communicating, and could exhibit appropriate behavior, Ms. Laxton and Dr. Du Bois found the defendant failed competency in the other categories.

---

[5] Dr. Graddy testified that the distinction, between the diagnoses of schizophrenia continuous and schizophrenia, multiple episodes, currently in an active episode, is that the defendant had gotten better on medication in the past, such that Dr. Graddy could not conclude the defendant to have suffered one continuous episode. (4/13/18 Tr. at 115 (Graddy)). Dr. Graddy viewed the diagnostic difference between the two as "minor." (Graddy Report at 2, Note 2).

At MCC New York, the defendant was diagnosed with Schizoaffective Disorder, Bipolar Type, Continuous. Dr. Du Bois did not conclude the defendant suffered this diagnosis under his review because although the diagnoses were on the same spectrum, at FMC Butner "there was the lack of observation of a manic episode." (4/13/18 Tr. at 97-98 (Du Bois); FMC Butner Report at 9 ("[A] diagnosis of Schizophrenia appears to better explain his recent presentation")).

Ms. Laxton and Dr. Du Bois determined that the defendant provided a view of the evidence "often rooted in his delusional beliefs about the government," and found the defendant to suffer a "severe impairment" in the rational understanding of the proceedings against him. (4/13/18 Tr. at 58, 64 (Du Bois); FMC Butner Report at 11).  His delusional beliefs concerning technology also demonstrated his difficulty rationally understanding proceedings.  (Id. at 11-12) (defendant had stated that a prosecutor's cell phone led directly to a judge losing her voice in a prior hearing, stating, "technology launches an electric signal that is called appellate malpractice . . . They're racketeering the court through the cell phone.  The lawyer is using technology that is not compliant, which is an objectionable offense").  Further, the defendant's assessment of the facts in the case – that the defendant was trying to warn agents of a potential threat on the President by providing them with a keyboard the defendant stated was a threat, further made sense only in the context of his delusional beliefs.  (Id. at 12).

The defendant was also found incompetent to testify.  As stated by Ms. Laxton:  "Mr. Gamarra would likely struggle to testify relevantly and rationally in his case due to his difficulty communicating in a clear and coherent way and without discussing further his delusional belief systems that aren't always relevant to his particular case and legal circumstances."  (4/13/18 Tr. at 23).  See also (4/13/18 Tr. at 65 (Du Bois); FMC Butner Report at 12-13).  Ms. Laxton and Dr. Du Bois also believed that the defendant could testify in a way that incriminated himself without his awareness that he was doing so.  (4/13/18 Tr. at 24 (Laxton); 4/13/18 Tr. at 64-65 (Du Bois); FMC Butner Report at 12-13).

Ms. Laxton and Dr. Du Bois also believed through their observations and standard assessments that the defendant lacked the capacity to consult with counsel.  First, they believed that he did not understand what uses he could make of counsel.  The FMC Butner Report stated

that when given a hypothetical scenario that the defendant's attorney advised against testifying, the defendant stated, 'that's a delusional hypothetical . . . he can't do that." Second, the defendant's delusional beliefs and disorganized method of communication limited his ability to "disclose relevant facts in a clear, coherent, and rational manner." (FMC Butner Report at 13; 4/13/18 Tr. at 65 (Du Bois)).

    2.   The defendant refused to take prescribed antipsychotic medication.

During the time period that the defendant was reviewed at FMC Butner, the defendant was prescribed antipsychotic medication, but he only took the medication sporadically. (4/13/18 Tr. at 26 (Laxton)) (referencing notes of Dr. Laura Enman (noting defendant took prescribed antipsychotic "only 22 days between October 26, 2017, and January 12, 2018"); FMC Butner Report at 6). The defendant told the treatment team that he "died" on two occasions taking medication, and also expressed concerns about whether the medications were addictive, his own religious beliefs related to the taking of addictive medicine, and his lack of mental illness (4/13/18 Tr. at 26-27). The defendant's views contrasted with those of his family, which reported that the defendant "functions much better when he's taking medication," and was "highly intelligent and functioned well when he complied with medications." Even the defendant had an insight that he benefited from the medication. (FMC Butner Report at 6 (On November 6, 2017, the defendant acknowledged benefits to the medication, including improvements to sleep and his "mind")). Dr. Du Bois did not know if the defendant would adhere to a medication regimen voluntarily, and assumed, based on past behavior, that the defendant would not. (Tr. 4/13/18 at 100).

With the defendant declining to take medication consistently, neither Ms. Logan nor Dr. Du Bois, thought that the defendant would likely be restored to competence without the taking of

antipsychotics. FMC Butner Report at 14 ("Based upon the data that most individuals with chronic psychotic disorders have some degree of improvement in the symptoms of their illness, as well as minor improvements observed by the undersigned, it is opined that his competency is likely to be restored with adherence to a medication regimen").

Dr. Graddy, a licensed and board-certified psychiatrist, stated that involuntary medications are substantially likely to render the defendant competent to stand trial; and that the medication would be substantially unlikely to have side effects that would interfere significantly with the defendant's ability to assist counsel in conducting a trial defense. (Graddy Report at 3).[6] He testified that the defendant was consistent with other Sell defendants who did regain their competency under antipsychotic medication, and testified that the defendant's prior history of medication treatment supported that belief. (4/13/18 Tr. at 116 (Graddy)). "It's very clear that [the defendant's mental illness] improves with antipsychotic medication." (4/13/18 Tr. at 115 (Graddy)). Indeed, Dr. Graddy tied his multiple episode diagnosis to the defendant's improvements on antipsychotics. Id. Cf. United States v. Dillon, 943 F. Supp.2d 30, 36-37

---

[6] Dr. Graddy did not meet with the defendant in preparing his recommendation. However, Dr. Graddy did review the internal BOP records and the external records from the other hospitals. (4/20/18 Tr. at 33-34). This review includes, for example, a review of the FMC Butner Report, which relied in part on in person observations by Ms. Laxton and Dr. DuBois, and data entry notes of Dr. Laura Enman, the pharmacist at FMC Butner, which were entered into evidence as Exhibit 12. For example, on October 26, 2017, Dr. Enman met with Gamarra to discuss taking a medication, quetiapine, as needed. Dr. Enman stated "Significant delusional material evident throughout the appointment, generally focused on electrical wavelengths that are affecting his mind and the minds of his family members." Dr. Enman further wrote that:

> He has refused his quetiapine for the last three nights and has refused several other doses in the month of October. Mr. Gamarra reports the use of an "addictive" medication is against his religious beliefs. We discussed quentiapine is not an addictive substance if taken as prescribed. Mr. Gamarra is not willing to take any other antipsychotic medication at this time.

(Enman Notes at 1-3 (10/26/17)).

(D.D.C. 2013) (Bates, J.) (noting favorably defendant's study statement that "his psychotic symptoms have responded favorably to medication in the past."). Dr. Graddy testified that the scientific literature was "strongly supportive of [antipsychotic] treatment for patients with psychotic disorders to regain competency," and offered two documents entitled "FMC Butner Sell Appendix" as a summary of scientific information concerning the use of antipsychotics to treat schizophrenia and other psychotic disorders. (Hereinafter, unless otherwise stated, "3/23/18 Sell Appendix").[7] Dr. Graddy relied on prior studies that reviewed treatment outcomes. His recollection was that all the studies he reviewed and testified about in this case were all peer-reviewed. (4/20/18 Tr. at 20 (Graddy)). In almost all studies cited by Dr. Graddy, the success rate of competency restoration using antipsychotics exceeded 75 percent. (3/23/18 Sell Appendix at 2 (citing Mossman and Cochrane et al)).[8] Graddy also testified that he had professional experience in using antipsychotics to treat patients with schizophrenic symptoms. (4/13/18 Tr. at 118 (Graddy)). Based on his clinical experience, Dr. Graddy viewed the defendant as similar to other patients who responded to antipsychotic medications (4/20/18 Tr. at 51 (Graddy)).

---

[7] Dr. Graddy initially testified to a Sell Appendix dated November 17, 2017, and that document was admitted as Government Exhibit 10. On cross-examination, Dr. Graddy clarified that he had a second version of the Sell Appendix that included a footnote referencing a specific medication. The testimony makes clear that during his initial testimony, both Dr. Graddy and the litigants were referencing the November 17, 2017 report. Subsequently, on April 18, 2018, defense counsel moved into evidence without objection the subsequent, March 23, 2018 version of the Sell Appendix.

Dr. Graddy testified none of the differences between the reports would make a difference to the diagnosis or treatment of the defendant. (4/20/18 Tr. at 22-29 (Graddy)).

[8] In the Cochrane et al. study, 132 patients were studied. 76 percent diagnosed with schizophrenia improved sufficiently to be restored to competency, and 81.8 percent diagnosed with schizoaffective disorder improved sufficiently to be restored to competency status. 73.3 percent of patients with delusional disorder – which the defendant is not diagnosed with -- were restored as well. In United States v. Dillon, 738 F.3d 284, 298 (D.C. Cir. 2013), the Court of Appeals affirmed that even if the defendant was suffering from Delusional Disorder and the 73.3 percent rate of success applied, it would not have been error for the District Court to rely on that percentage of success in ordering involuntary medication.

Dr. Graddy further testified that side effects from the antipsychotics would be unlikely to cause the defendant to be incompetent. (4/13/18 Tr. at 121 (Graddy)). In a review of potential side effects of the medications, Dr. Graddy confirmed that he factored in the risk of side effects, the management of side effects, and the risks to the defendant's overall cognition and ability to work with counsel, in making a determination that the treatment plan would be substantially unlikely to interfere with the defendant's ability to work with counsel. (4/20/18 Tr. at 47-48 (Graddy)).

In sum, the testimony and evidence show the defendant clearly suffers from a schizophrenic illness, and the differences among the diagnoses are not material. The defendant's illness leaves him without a rational understanding of the proceedings, and impairment with respect to his ability to testify and to consult with counsel. The defendant failed to take medication on his own on a consistent basis, when it is substantially likely that medication would restore him to competency, and that doing so is unlikely to interfere with the defendant's ability to work with counsel.

**<u>Involuntary medication is medically necessary and appropriate.</u>**

The third and fourth prongs overlap. The third prong identified in <u>Sell</u> is whether involuntary medication is necessary to further the government's interests; that is, the court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. 539 U.S. at 181. The fourth prong of the <u>Sell</u> analysis is whether the administration of the drugs is medically appropriate. <u>Id</u>.

Dr. Du Bois testified that delusions "often don't respond to behavioral or therapy techniques," and that both he and Ms. Laxton "attempted to challenge some of those beliefs or introduce evidence which would oppose them, which is the recommended method for opposing

or trying to change delusional beliefs, and they did not – they were not effective. So I didn't think that individual therapy would have been any more effective either." (4/13/18 Tr. at 95 (Du Bois)). Although the defendant was also assigned to a discussion group, this competency group, was "mostly psychoeducational in that it mostly teaches about the factual elements. They do discuss some other elements which are helpful in terms of just complying, for instance, with medication just generally to the individuals in the group. But in Mr. Gamarra's case, that wasn't the area that appeared to be the most significant or impactful deficit." (4/13/18 Tr. at 96 (Du Bois)).

Dr. Graddy summarized in his report that less intrusive means were unlikely to achieve substantially the same results as involuntary medication. (Graddy Report at 3). He further testified that "Other treatments are not very effective for these conditions." (4/13/18 Tr. at 118-119 (Graddy)), and specifically determined that other treatment options were not "a viable option" for the defendant. (4/13/18 Tr. at 146-47). As Dr. Graddy summarized and adopted in his Sell Appendix:

> There is no convincing evidence in the published literature that patients with chronic schizophrenia or related psychotic disorders significantly respond to psychotherapy alone compared to the response to treatment with antipsychotic mediation augmented with psychosocial interventions. Most proponents of cognitive behaviorally oriented psychotherapy for schizophrenia acknowledge the biological basis of the disorder and actively promote medication compliance.

(3/23/18 Sell Appendix at 3).

He further testified that side effects from the antipsychotics would be unlikely to cause the defendant to be incompetent. (4/13/18 Tr. at 121). As noted above, Dr. Graddy confirmed that the risks of side effects would be substantially unlikely to interfere with the defendant's ability to work with counsel. (4/20/18 Tr. at 47-48).

At bottom, there is no evidence that therapy – by itself – would restore the defendant's competency, but there is substantial evidence that antipsychotics will.  Moreover, as to potential side effects that the defendant might experience under an antipsychotic regimen, the FMC Butner program includes a series of options including the use of lower doses, switching to different medications, and treatment of symptoms.  (3/23/18 Sell Appendix at 7-10).  As to whether the medical treatment was appropriate, Dr. Graddy stated:

> Mr. Gamarra has a mental condition that responds to medication.  His condition is serious.  I believe that he is suffering due to this disorder.  And I believe this treatment is appropriate and would be – if he were to come and see me with this complaint in the community, I would recommend that he receive treatment.  If his family were to approach me, I would recommend he receive treatment.  He has received it every time he's gone into a hospital.
>
> So it is clearly medically appropriate.

(4/13/18 Tr. at 122 (Graddy)).

At this stage, no reasonable option exists other than to medicate the defendant.

## **CONCLUSION**

WHEREFORE, the government respectfully requests that the Court find that the government has established by clear and convincing evidence that the defendant should be involuntarily medicated under the Sell four-factor test, thereby granting the government's motion to medicate involuntarily the defendant as proposed by Dr. Graddy in his report.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number  472-845


By:_____/s/_____
JEFF PEARLMAN
(DC BAR #: 466901)
Assistant United States Attorney
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7228
Jeffrey.pearlman@usdoj.gov