UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 17-65 (JDB) |
| JEAN-PAUL GAMARRA, | |
| Defendant. | |

**FILED**

OCT 1 9 2018

Clerk, U.S. District and
Bankruptcy Courts

## MEMORANDUM OPINION

The government moves to involuntarily medicate defendant Jean-Paul Gamarra, who suffers from mental illness, to render him competent to stand trial. Pursuant to <u>Sell v. United States</u>, the Court must determine whether "in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, [the government has] shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it." 539 U.S. 166, 183 (2003). Upon consideration of the pleadings, the testimony presented at the <u>Sell</u> hearing before Magistrate Judge Deborah A. Robinson held on April 13, 18, and 20, 2018,[1] and the entire record herein, the Court will grant the government's motion.[2]

---

[1] <u>See</u> Tr. of <u>Sell</u> Hr'g, Apr. 13, 2018 ("4/13/18 Hr'g Tr.") [ECF No. 18]; Tr. of <u>Sell</u> Hr'g, Apr. 18, 2018 ("4/18/18 Hr'g Tr.") [ECF No. 24]; Tr. of <u>Sell</u> Hr'g, Apr. 20, 2018 ("4/20/18 Hr'g Tr.") [ECF No. 21].

[2] At the status conference held on October 17, 2018, counsel for both parties stated that they had no objection to this Court deciding this motion based upon the record, including the transcripts of the <u>Sell</u> hearing.

1

## BACKGROUND[3]

Gamarra was arrested outside the White House on March 28, 2017, after approaching United States Secret Service Officers with a package that he claimed contained a detonator for a nuclear device. Gamarra, 308 F. Supp. 3d at 231. He was indicted for threatening the President in violation of 18 U.S.C. § 871 and threatening and conveying false information concerning the use of an explosive device in violation of 18 U.S.C. § 844(e). Id. at 232. The government represents that Gamarra's "threatening conduct caused a significant area of the District [of Columbia] to be closed to traffic and commerce for approximately an hour and forty minutes." Gov't's Mot. to Medicate Involuntarily Def. to Restore Competency [ECF No. 22] ("Gov't's Mot.") at 6. Gamarra was found to have a mental disease that rendered him incompetent to stand trial, and he was hospitalized at Federal Medical Center ("FMC") Butner for further evaluation pursuant to 18 U.S.C. § 4241(d). Gamarra, 308 F. Supp. 3d at 232.[4]

At FMC Butner, forensic psychologist Evan S. Du Bois, Psy.D., and predoctoral psychology intern Kelsey L. Laxton completed a forensic evaluation, ultimately concluding that Gamarra remained "not competent to proceed to trial" but that "his competency is likely to be restored with adherence to a medication regimen." Gov't's Ex. 2 ("Forensic Evaluation") at 14.[5] FMC Butner Staff Psychiatrist Dr. Logan Graddy provided a forensic addendum and treatment plan that similarly concluded that administration of antipsychotic medication was medically appropriate, that other interventions were unlikely to be beneficial without medication, and that

---

[3] The Court incorporates by reference fuller recitations of the factual and procedural history of this case in its prior opinions. See United States v. Gamarra, 308 F. Supp. 3d 230, 231–33 (D.D.C. 2018); United States v. Gamarra, Crim. No. 17-65, 2018 WL 4954128, at *1–3 (D.D.C. Oct. 12, 2018).

[4] Section 4241(d) permits a defendant to be hospitalized for up to four months, but Gamarra ultimately spent more than six months at FMC Butner. Id. This Court held that his extended hospitalization violated the statute but that this did not justify dismissal of the charges against him. Id. at 233–34.

[5] All cited exhibits were admitted without objection during Sell proceedings before Magistrate Judge Robinson. See Apr. 13, 2018 Min. Entry (admitting Gov't Exs. 1–3, 11); Apr. 18, 2018 Min. Entry (admitting Gov't Exs. 10, 10A); Apr. 20, 2018 Min. Entry (admitting Gov't Exs. 4, 12).

the benefits of medication would outweigh the risks. Gov't's Ex. 11 ("Forensic Add. and Treatment Plan") at 1, 3.

The government orally moved to have defendant involuntarily medicated, and the defendant opposed the motion. Magistrate Judge Robinson held a <u>Sell</u> hearing over three days in April 2018 at which Dr. Du Bois, Laxton, and Dr. Graddy testified for the government. The defendant did not present any witnesses.

Dr. Du Bois, whom the court qualified as an expert in clinical forensic psychology, testified that, in his opinion and to a degree of professional certainty, Gamarra suffers from "schizophrenia, continuous," based on observations of delusional ideation, disorganized speech, and possible auditory hallucinations. 4/13/18 Hr'g Tr. at 55:9–11; 58:3–10. Dr. Du Bois opined that Gamarra was not competent to stand trial because, although Gamarra exhibited a basic factual understanding of court proceedings in general, his understanding of his case and the charges against him were "rooted in his delusional beliefs, which were a result of his schizophrenia." <u>Id.</u> at 64:1–23. Dr. Du Bois further opined that Gamarra would have difficulty testifying because he "would have difficulty communicating clearly and organizing his thoughts and testimony" and because his mental illness made it possible he would incriminate himself. <u>Id.</u> at 64:24–65:14. Dr. Du Bois concluded that Gamarra's disorganized speech would also impair his ability to consult with counsel. <u>Id.</u> at 65:15–25.

Dr. Du Bois testified that he did not recommend individual therapy in place of antipsychotic medication because delusional beliefs, like those to which Gamarra ascribed, "often don't respond to behavioral or therapy techniques." <u>Id.</u> at 94:24–95:11. He and Laxton "attempted to challenge some of [Gamarra's delusional] beliefs or introduce evidence that would oppose them,

which is the recommended method for opposing or trying to change delusional beliefs, . . . [but this course of treatment was] not effective." Id. at 95:12–17.

Laxton, who was qualified as an expert in clinical forensic psychology without objection,[6] testified that, in her opinion and based on a reasonable degree of professional certainty, Gamarra suffers from "schizophrenia, continuous," and was not competent to stand trial. Id. at 13:10–15, 18:8–19, 20:12–18. In particular, Laxton testified that while Gamarra had a factual understanding of the court proceedings, including an understanding of basic legal terminology and concepts, he had "some difficulty rationally understanding the proceedings against him, especially the potential consequences of his case." Id. at 21:6–22. She explained that Gamarra's understanding of the charges against him and his defenses to those charges were themselves rooted within his delusional belief system. Id. at 22:23–23:10. As a consequence, she opined that Gamarra lacked capacity to testify because his condition made it difficult for him to communicate "in a clear and coherent way . . . without discussing further his delusional belief systems" and because he would "likely : . . incriminate himself without realizing that he was doing so." Id. at 23:14–24:8. For essentially the same reasons, Laxton concluded that Gamarra also lacked capacity to consult with counsel. Id. at 24:9–19. In addition, Laxton noted that Gamarra's delusional beliefs around electric waves, computers, and telephones would affect his competency to stand trial; for example, "in the courtroom, he thought that the presence of the telephone would be detrimental to him or his case or even have some physical impact on [the] judge . . . ." Id. at 22:6–22.

Laxton also testified that, in her opinion, administration of antipsychotic medication was a "key piece" of Gamarra's treatment plan that would be "necessary to get [Gamarra's] symptoms

---

[6] The magistrate judge received Laxton, who served as an intern under Dr. Du Bois, as an expert "with the understanding that the licensed clinical psychologist who approved the report will also be a witness in this proceeding." Id. at 13:13–15.

in control to a point that he would be competent to stand trial," and it was "unlikely" that Gamarra's condition would improve without medication. Id. at 37:10–38:9. Though staff had "encouraged Mr. Gamarra to take medications," Laxton explained that Gamarra refused to take antipsychotic medications at various times while at Butner because of his beliefs that "he had . . . died previously taking another medication," "that he does not have a mental illness and does not need those medications," and that his religion prohibited taking what he believed were addictive medications. Id. at 26:21–27:10; 37:20. Ms. Laxton observed, however, that during her examination Gamarra communicated more clearly on medication and that this improvement was corroborated by reports from Gamarra's family (and Gamarra himself) that antipsychotic medication improved Gamarra's condition. Id. at 27:23–28:18. Gamarra's family members reported that he was "highly intelligent and functioned well when he [had] complied with medications" in the past. Id. at 28:4–8. Laxton herself observed that Gamarra "communicated slightly better" during the brief periods at FMC Butner when he was "more compliant with [prescribed antipsychotic] medication." Id. at 28:16–18.

Dr. Graddy, whom the court qualified as an expert in the field of forensic psychiatry, testified that, in his opinion and based on a reasonable degree of medical certainty, Gamarra suffers from "schizophrenia, multiple episodes, currently in[ an ]active episode." Id. at 112:2–11; 114:8–15. Dr. Graddy did not meet Gamarra in person, but he "reviewed the full record" before making his diagnosis. Id. at 114:8–115:10. His diagnosis, in contrast to Dr. Du Bois and Laxton's diagnosis of "schizophrenia, continuous," was based on his observation that "Gamarra has gotten better in the past on medications, significantly better, such that I have classified him as having multiple distinct episodes rather than one continuous episode." Id. at 115:19–25.[7]

_____

[7] Dr. Samantha DiMisa diagnosed Gamarra with schizoaffective disorder, a related but distinct condition, during his time at the Metropolitan Correctional Center ("MCC") in New York, New York. Forensic Add. and

Dr. Graddy noted several studies indicating that antipsychotic medications restored competency in more than seventy-five percent of defendants suffering from schizophrenia and other psychotic disorders. Of particular relevance, Dr. Graddy cited a 2012 study in which 62 of 81 defendants diagnosed with schizophrenia were restored to competency with antipsychotic medications, for a restoration rate of approximately 76%. See 4/18/18 Hr'g Tr. at 40:20–41:18 (discussing Gov't's Ex. 10 at 3). Although Dr. Graddy did not directly evaluate Gamarra's competency, Dr. Graddy noted that Gamarra "appears . . . to be consistent with other . . . defendants who did regain their competency when treated with antipsychotic medication" and that this conclusion was "stronger" because Gamarra "has documented improvement on antipsychotic medication in the past." 4/13/18 Hr'g Tr. at 116:1–11. Dr. Graddy testified that antipsychotic medications "are generally safe and effective" and that "patients with schizophrenia or schizoaffective disorder . . . need medications to improve" because "[o]ther treatments are not very effective for these conditions." Id. at 118:11–24. Dr. Graddy did not believe that other, less-invasive treatments would be effective. Id. at 121:10–13; 143:4–8. Dr. Graddy stated that he would propose beginning Gamarra's treatment with the antipsychotic medication risperidone because it "is a medicine he took in the past" that he "appeared to tolerate . . . well" and that had been documented to "improv[e] . . . his mental state." Id. at 123:15–18.

In addition, Dr. Graddy opined that medication would be "medically appropriate," particularly since "he appears . . . to be a patient who does get better with treatment." Id. at 120:11–19. Dr. Graddy explained that antipsychotic medication is the course of treatment he would recommend to Gamarra "if he were to come and see me with this complaint in the community" or

Treatment Plan at 2 n.2. Dr. Graddy's report explained that "this diagnosis and the treatment required for it are not significantly different from [his] diagnosis" of schizophrenia. Id. Furthermore, Dr. Graddy noted that the "diagnostic difference" between his conclusion that Gamarra suffered from schizophrenia, multiple episodes, currently in active episode, and Dr. Du Bois's diagnosis of schizophrenia, continuous, "is minor." Id.

6

"[i]f his family were to approach me" seeking advice on treatment. Id. at 122:11–23. He also noted that antipsychotic medications were prescribed to Gamarra "every time he's gone into the hospital." Id. Dr. Graddy also highlighted that he considered risperidone "one of our best medications" for treating patients with schizophrenia-type diagnoses, even in light of the potential risk of side effects. 4/20/18 Hr'g Tr. at 43:1–12.

As to potential side effects, Dr. Graddy testified that antipsychotic medications are known to have a significant risk of serious side effects, including acute dystonic reactions (involuntary muscle contractions), parkinsonism (characterized by muscle rigidity, tremors, and decreased spontaneous facial expressions), dyskinesias (characterized by involuntary grimacing, tongue movements, rapid blinking, and rapid limb movement), and akathisia (uncomfortable inner restlessness). 4/18/18 Hr'g Tr. 22:15–24:6; 31:22–32:16; 38:6–40:19. Dr. Graddy testified that various studies suggested that the reaction rates for antipsychotic medications generally ranged from two to ten percent for dystonic reactions, up to fifty percent for parkinsonism, up to thirty-two percent for dyskinesias, and up to thirty percent for akathisia. Id. at 24:23–25:1; 33:7–25; 39:3–9; 40:6–11.

He opined, however, that if Gamarra were medicated, any side effects that Gamarra might experience would be closely monitored and managed by medical staff, either by adjusting the dosage of antipsychotic medication, prescribing a different antipsychotic medication, or by treating the side effects with other medications. 4/13/18 Hr'g Tr. at 122:24–123:25. Dr. Graddy acknowledged that Gamarra's medical records noted that he had "complained of some neuromuscular symptoms," particularly "stiffness," in response to risperidone, which a treating physician would "watch closely if we have to treat him with that" medication. 4/20/18 Hr'g Tr. at 36:19–37:3. But because negative reactions tend to "occur early in treatment" and would be noted

by medical providers, Dr. Graddy believed the risk of Gamarra experiencing, for example, a dystonic reaction while taking risperidone to be "fairly low since he's tolerated [this] medicine in the past." Id. at 25:12–16; 28:2–4; 4/20/18 Hr'g Tr. at 36:7–13; see also 4/20/18 Hr'g Tr. 19:22–20:2 (Dr. Graddy explaining his use of past medical records in recommending medication to patients). Furthermore, any side effects from the medication would be "very unlikely to cause him to not be able to be competent" to stand trial. 4/13/18 Hr'g Tr. at 120:20–7. In all, despite the risks of side effects, Dr. Graddy stated that "from a medical perspective, benefits of treatment, in my opinion, outweigh the risks." Id. at 120:16–19.

## DISCUSSION

"Although an individual has a constitutionally protected interest in avoiding involuntary medication, that interest can be overcome by an 'essential' or 'overriding' state interest in some circumstances." United States v. Dillon, 943 F. Supp. 2d 30, 34 (D.D.C. 2013), aff'd, 738 F.3d 284 (D.C. Cir. 2013) (quoting Sell, 539 U.S. at 179–80). The Supreme Court in Sell "prescribed a detailed, four-part inquiry for district courts to undertake prior to authorizing involuntary medication to restore defendants to competency." United States v. Dillon, 738 F.3d 284, 290 (D.C. Cir. 2013). Pursuant to Sell,

> a court may order the administration of medication to render a mentally ill defendant competent to stand trial on criminal charges if:
> (1) doing so advances an important government interest, such as bringing to trial an individual accused of a serious crime;
> (2) the medication is substantially likely to render defendant competent to stand trial[] and substantially unlikely to have side effects that will interfere significantly with defendant's ability to assist counsel in conducting a trial defense;
> (3) alternative less intrusive treatments are unlikely to achieve substantially the same result; and
> (4) administration of the medication is medically appropriate, i.e., in the patient's best interest in light of his medical condition.

<u>Dillon</u>, 943 F. Supp. 2d at 34–35 (citing <u>Sell</u>, 539 U.S. at 180–82). The government must prove each <u>Sell</u> factor by clear and convincing evidence. <u>Dillon</u>, 738 F.3d at 291–92.[8]

## I.   IMPORTANT GOVERNMENT INTEREST

The first <u>Sell</u> factor requires a court to "find that <u>important</u> government interests are at stake." <u>Sell</u>, 539 U.S. at 180. "The [g]overnment's interest in bringing to trial an individual accused of a serious crime is important," but courts "must consider the facts of the individual case," as "[s]pecial circumstances may lessen the importance of that interest." <u>Id.</u> In particular, "the defendant already having been confined for a significant period of time" may "undermine the importance of the government's interest in prosecution." <u>Dillon</u>, 943 F. Supp. 2d at 35. Furthermore, the possibility that a defendant might face "lengthy confinement in an institution for the mentally ill" notwithstanding his inability to stand trial can "diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." <u>Sell</u>, 539 U.S. at 180.

The government asserts that important governmental interests are at stake in this case because it seeks to bring Gamarra to trial on charges of serious offenses. The crimes with which he is charged involve threats to health and safety, and "the government has a significant interest in bringing . . . to justice" defendants charged with "[a]ny threat on a governmental official, particularly the President." Gov't's Mot. at 6. Furthermore, "[f]ailure to bring such offenders to

---

[8] As a threshold inquiry, the Supreme Court in <u>Sell</u> directed that a court should consider whether forced medication might be warranted on dangerousness grounds—that is, due to the danger defendant poses to himself or others—before determining whether involuntary medication to restore competency is appropriate. <u>Sell</u>, 539 U.S. at 182–83 (discussing involuntary medication criteria under <u>Washington v. Harper</u>, 494 U.S. 210, 225–26 (1990)). Neither party contends that Gamarra would qualify for forced medication under <u>Harper</u>. Furthermore, Dr. Graddy's report concluded that Gamarra would not "meet criteria under BOP policy" for forced medication under <u>Harper</u> because "Gamarra was able to function adequately in the Mental Health Department [at FMC Butner] without engaging in behavior that posed a risk of being dangerous to himself or others." Forensic Add. & Treatment Plan at 1–2. Accordingly, this court will proceed past this threshold inquiry to analysis of the <u>Sell</u> factors.

justice has the potential to substantially undermine or interfere with the orderly process of government and thereby have a negative impact on the community as a whole." Id.

The D.C. Circuit has not yet "wade[d] into the debate among [its] sister circuits about whether the seriousness of a crime is measured by the statutory maximum or the likely guideline sentence, or both," Dillon, 738 F.3d at 292, so this Court will examine both the statutory maximum and the likely Guidelines sentence.[9] If convicted, the government estimates that Gamarra would face a recommended sentencing range of twenty-one to twenty-seven months' imprisonment, based upon a Base Offense Level of 12 under U.S. Sentencing Guideline § 2A6.1 and a four-level increase under § 2A6.1(b)(4)(A) because the offense allegedly resulted in "substantial disruption of public, governmental, or business functions or services." U.S. Sentencing Guidelines Manual § 2A6.1 (U.S. Sentencing Comm'n 2016) ("U.S.S.G"); Gov't's Mot. at 7.[10] The Court also notes that all criminal offenses with a total offense level of sixteen fall within Zone D of the U.S.

---

[9] Circuit courts have applied the first Sell factor differently. Most circuits seek "objective parameters by which to assess seriousness," including consideration of "the potential statutory penalty and/or Guideline range of imprisonment which may be imposed." United States v. Green, 532 F.3d 538, 547 (6th Cir. 2008). Some circuits look primarily to statutory maximums and minimums, see id. at 549; United States v. Evans, 404 F.3d 227, 237–38 (4th Cir. 2005), while other courts consider both statutory maximum sentences and likely sentencing ranges under the Guidelines, see United States v. Valenzuela-Puentes, 479 F.3d 1220, 1226 (10th Cir. 2007).

Furthermore, because the Supreme Court noted in Sell that under the first factor a court must "consider the facts of the individual case in evaluating the Government's interest in prosecution," 539 U.S. at 180, the Eleventh Circuit has applied a circumstance-specific approach to determine whether a crime is "serious." See, e.g., United States v. Fuller, 581 F. App'x 835, 836 (11th Cir. 2014) (per curiam) (noting no need to "decide whether the charged offense here . . . is, as a general matter, a serious crime" because "the facts of the instant case" were sufficiently alarming to conclude the defendant's alleged conduct was "serious"). The Ninth Circuit follows a blended approach, starting with the likely Guidelines range and then considering "the specific facts of the alleged crime as well as the defendant's criminal history." Onuoha, 820 F.3d at 1055.

Though the D.C. Circuit has not yet weighed in, Dillon, 738 F.3d at 292, the Court notes that the articulated standard implies that a court should first examine objective criteria of the crime's seriousness (such as the statutory maximum and Guidelines range), and then it should evaluate the facts of the individual case in its "special circumstances" analysis, see id. (stating that "[a] court must first determine whether the charged crime is 'serious'" before moving on to a consideration of whether special circumstances apply based on "the specific facts of the case before it"). Accordingly, the Court will follow this approach here.

[10] Because the Guidelines provide that defendants with a total offense level of sixteen be imprisoned for twenty-one to twenty-seven-months only if the defendant has a criminal history category of I, the Court presumes that the government also represents that Gamarra would likely be assigned a criminal history category of I. See U.S.S.G. Ch. 5, Pt. A (Sentencing Table).

Sentencing Guidelines Sentencing Table regardless of an offender's criminal history category, which reflects the Sentencing Commission's judgment that these offenses are of a type that always require that a term of imprisonment be imposed—rather than, for example, probation or home confinement. See U.S.S.G. Ch. 5, Pt. A; U.S.S.G. §§ 5B1.1, 5C1.1. Finally, each offense carries a significant maximum penalty that reflects "legislative judgments concerning the severity of the crime." Gov't's Reply to Def.'s Opp'n [ECF No. 26] ("Gov't's Reply") at 2–3 (citing Evans, 404 F.3d at 237–38)). As the government notes in its brief, threatening the President, 18 U.S.C. § 871, and threatening the use of an explosive device, 18 U.S.C. § 844(e), carry maximum terms of imprisonment of five and ten years, respectively. Gov't's Mot. at 7.

Here, the Court concludes that both 18 U.S.C. §§ 871 and 844(e) may qualify as "serious crimes" for purposes of the Sell analysis. This Court has previously found that making threats against the President in violation of 18 U.S.C § 871 is a "serious crime," Dillon, 943 F. Supp. 2d at 35–36; see also United States v. Aleksov, Crim. No. 1:08-57, 2009 WL 1259080 (D.D.C. May 7, 2009), at *2, and other federal courts have determined that threatening the use of explosives in violation of 18 U.S.C. § 844(e) is similarly "serious," United States v. Onuoha, 820 F.3d 1049, 1054–56 (9th Cir. 2016) (describing alleged violation of 18 U.S.C. § 844(e) as "sufficiently serious" but vacating order to involuntarily medicate on other grounds); United States v. Milliken, Crim. No. 3:05-6-J-32, 2006 WL 2945957 (M.D. Fla. July 12, 2006) (finding alleged violations of 18 U.S.C. § 844(e) to be "no doubt serious"). The fact that these crimes repeatedly have been found to be "serious," alongside consideration of the maximum sentences that may be imposed and the sentence likely to be imposed under the Guidelines, persuades the Court that both crimes generally qualify as "serious crimes" for purposes of its Sell analysis.

Gamarra does not dispute that he faces charges for "serious crimes." He argues, rather, that two "special circumstances" nevertheless sufficiently mitigate the government's interest in prosecution. Def.'s Opp'n to Gov't's Mot. ("Def.'s Opp'n") [ECF No. 25] at 7.

Gamarra first argues that his lengthy pre-trial detention negates the government's interest in his continued prosecution. See id. at 7–9. As noted above, Gamarra has been in federal custody for almost nineteen months, since March 2017, and the government estimates that defendant would face a Guidelines range of twenty-one to twenty-seven months' imprisonment if convicted, see Gov't's Mot. at 7. Therefore, Gamarra's potential term of imprisonment under the Guidelines— without accounting for the possibility of good-time credit—would end between December 2018 and June 2019. Gamarra notes that "at least three or four months of continuous treatment" with antipsychotic medication is anticipated to be required before his competency is likely to be restored. Def.'s Opp'n at 8 (quoting Gov't's Ex. 10 at 9). Gamarra also stated his intention to appeal an order granting the government's motion, which would add additional time to Gamarra's stay in federal custody. Id. at 7–8. In all, Gamarra estimates that thirty-four months—seven months longer than the upper end of a sentence imposed under the Guidelines—could pass between his arrest and the beginning of trial if the Court grants the government's motion. Id. at 8.

On this point, the government argues that a lengthy term of pre-trial detention, caused in part by Gamarra's decisions not "to take prescribed medication" and, if the government is successful in this motion, to "pursue[] his appellate rights," does not "negate the government interest." Gov't's Reply at 1–2. Further, the government cites cases in which long terms of pretrial detention did not preclude a court from finding that the important-governmental-interest prong of the Sell test had been met. See id.[11]

---

[11] For example, in Aleksov, sixteen months' detention did not preclude finding an important government interest when the estimated sentencing range was ten to thirty-three months. 2009 WL 1259080, at *2. In Dillon, the

The Court is attentive to the fact that Gamarra has now been detained for over eighteen months and that, if convicted, has therefore already served a significant portion of the recommended Guidelines sentence of twenty-one to twenty-seven months' incarceration. The length of Gamarra's pre-trial detention certainly lessens to some extent the government's interest in prosecuting him because even if convicted Gamarra would likely have already served a significant portion—or the entirety—of any sentence to be imposed.

However, the government's interest in prosecuting serious crimes is not limited to punishing an individual offender with a term of imprisonment. See United States v. Claflin, 670 F. App'x 372, 373 (5th Cir. 2016) (per curiam) ("Even if it were determined that Claflin had already served his likely sentence, such a circumstance does not defeat the Government's interest in prosecuting him."); United States v. Springs, 687 F. App'x 672, 674 (9th Cir. 2017) (affirming involuntary medication order of defendant facing twenty-one to twenty-seven month sentence who had "already been in custody for nearly three years").

As articulated by the Ninth Circuit, "there is an important distinction between incarceration itself[] and the significance for society of gaining a criminal conviction for a defendant's violation of the law." Onuoha, 820 F.3d at 1056. This principle is especially relevant in cases involving threats against public officers; as the government explains, "[a]ny threat on a government official" has the potential to undermine "the orderly process of government" more broadly. Gov't's Mot. at 6; see also United States v. Pfeifer, 661 F. App'x 618, 619 (11th Cir.

---

possibility of twenty-four months' detention did not preclude finding an important government interest when the estimated sentencing range was fifty-one to sixty months. 943 F. Supp. 2d at 35. In United States v. Bush, 585 F.3d 806 (4th Cir. 2009), the Fourth Circuit affirmed the district court's finding of an important government interest when the estimated sentencing range was twenty-four to thirty months and defendant had been held for eighteen months in pretrial custody and more than twelve months in home confinement. Id. at 815. And in United States v. Austin, 606 F. Supp. 2d 149 (D.D.C. 2009), the Court concluded that twenty-seven months' detention when a defendant faced a maximum sentence of forty-one months "certainly diminished" but still had not "eradicated" the government's interest. Id. at 151–152.

2016) (per curiam) (noting that "the Government's interest in prosecuting [the defendant for alleged violation of 18 U.S.C. § 871] is not only for protection of the president but to uphold the integrity of our system of government"). In addition, deterrence—both general and specific— forms an important part of the government's interest. Here, the government points out that Gamarra allegedly has demonstrated other "bizarre behavior in relation to public figures" in the past and thus that "the government has a significant interest in . . . limit[ing] his likelihood to reoffend." See id. at 6 & n.3. And a sentence is not limited to a term of imprisonment. As the Fourth Circuit noted in Bush, even when a defendant is convicted and released on a sentence of time served, the court may impose conditions of supervised release to "ensure that [the defendant] is not released into the public without appropriate monitoring." 585 F.3d at 815; see also Onuoha, 820 F.3d at 1056 (noting that "a sentence might also include a period of supervised release, which would help ensure that [defendant] does not return to making threats when released into the public" even when the defendant would "conceivably be sentenced to time served" (quotation omitted)). Finally, criminal convictions have other long-lasting consequences. For example, conviction on the instant offense could factor into Gamarra's criminal history score were he to commit an offense in the future. See U.S.S.G. § 4A1.1.

Although Gamarra's lengthy term of pre-trial detention weighs against a finding of an important government interest, these other considerations form a hefty counterbalance. Notwithstanding the length of his pre-trial detention, the government interest here is still strong because of the seriousness of the charged offenses, the role that prosecution of the offense would play in deterring Gamarra and others from committing such an offense, and the concomitant effects that follow a conviction, including the possibility that a term of supervised release may be imposed.

14

Accordingly, this Court concludes that the duration of his pre-trial detention alone will not negate the government's important interest in prosecuting this case.

Gamarra also argues that the government's interest in prosecuting him is mitigated by the likelihood that he will be civilly committed pursuant to 18 U.S.C. § 4246 if the government's motion to involuntarily medicate him is denied and he cannot proceed to trial. Def.'s Opp'n at 9–10. The government counters that "[t]here has been no finding, or proffer of evidence, that the characteristics of the defendant would lead to civil commitment in this case," Gov't's Reply at 4, and in any event, "the potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution," id. (quoting Sell, 539 U.S. at 180). The Court agrees with the government on this issue, as the Court has not been presented with any evidence regarding whether Gamarra would be likely to face civil commitment under 18 U.S.C. § 4246 (or any other statute) if he cannot stand trial. See Ohuoha, 820 F.3d at 1057 (not weighing the possibility of civil commitment against the government's interest where "[n]othing in the record indicates that [defendant] is a candidate for civil commitment").

In sum, the Court finds that the government has proven by clear and convincing evidence that—notwithstanding the length of Gamarra's pretrial detention in relation to his likely sentence—it has an important interest in prosecuting Gamarra because the alleged crimes are serious and special circumstances do not diminish the importance of the government's interest in prosecuting those crimes.

## II.    INVOLUNTARY MEDICATION WILL SIGNIFICANTLY FURTHER THAT INTEREST

"Second, the court must conclude that involuntary medication will significantly further those concomitant state interests." Sell, 539 U.S. at 181. In other words, involuntary medication must be "substantially likely to render the defendant competent to stand trial" but also

"substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Id.

The government argues that involuntary medication significantly furthers its interest in prosecuting Gamarra because medication is substantially likely to render Gamarra competent and unlikely to cause side effects that would impair his ability to participate in his defense. In particular, the government points to Dr. Graddy's testimony that Gamarra's "prior history of [successful] medication treatment" suggests that antipsychotic medication will render him competent and that his individual characteristics were "consistent with other Sell defendants who did regain their competency under antipsychotic medication." Gov't's Mot. at 12–13. The government also cited Dr. Graddy's opinion that antipsychotic medications were unlikely to cause side effects that would render Gamarra incompetent. Id. at 14.

In response, Gamarra seeks to cast doubt on Dr. Graddy's opinion, noting that Dr. Graddy did not examine Gamarra in person and that the data on which he based his opinions involved defendants diagnosed with several different psychiatric disorders and generalizations about the effects of antipsychotic medications as a class. Gamarra states that Dr. Graddy did not provide "the Court with any evidence concerning the restoration rate for defendants diagnosed [specifically] with schizophrenia who were treated specifically with [r]isperidone." Def.'s Opp'n at 12. In other words, Gamarra contends that the government should have cited a study of competency-restoration rates for defendants with schizophrenia treated with risperidone, not simply for defendants with schizophrenia treated with antipsychotic medications similar to and including risperidone. Similarly, Gamarra contends that the record does not include sufficient evidence "relating to the potential side effects of [r]isperidone administered to defendants

16

diagnosed with schizophrenia in Sell proceedings," as opposed to defendants with schizophrenia or other psychotic disorders. Id. at 13.

Although data on restoration rates and side effects from studies specifically examining defendants diagnosed with schizophrenia and prescribed risperidone would certainly be helpful to the Court, Dr. Graddy's failure to provide a study of such a narrowly tailored epidemiologic population does not prevent the government from carrying its burden of proof as to the second Sell factor. Here, the government has not only provided strong evidence that defendants suffering from schizophrenia are likely to have their competency restored from treatment with a class of antipsychotic medications that includes risperidone, but also that Gamarra in particular is likely to have his competency restored because his condition has responded favorably in the past to treatment with risperidone. Gamarra has provided no evidence to the contrary. Furthermore, while the testimony makes clear that antipsychotic medications pose a significant risk of serious side effects, the testimony also leads the Court to conclude that these side effects can be monitored and managed, Gamarra may be less likely to experience some of these side effects because of his treatment history and ability to tolerate these medications in the past, and any such side effects are unlikely to negatively impact his competency. Hence, the Court concludes that the government has proven by clear and convincing evidence that involuntary medication will significantly further the government's interest.

### III.   INVOLUNTARY MEDICATION IS NECESSARY

"Third, the court must conclude that involuntary medication is necessary to further those interests" and that "any alternative, less intrusive treatments are unlikely to achieve substantially the same results." Sell, 539 U.S. at 181.

The government supports its contention that involuntary medication is necessary by citing testimony from its experts stating that antipsychotic medication is likely to restore competency and that other treatments are unlikely to be effective. In particular, it references Dr. Du Bois and Laxton's efforts to challenge Gamarra's delusional beliefs and their conclusion that these techniques "were not effective." Gov't's Mot. at 15. The government also cites Dr. Graddy's opinion from both his testimony and the appendix to his report that there is generally no "viable" or "effective" treatment for schizophrenia other than antipsychotic medication. Id. at 15–16. As to Gamarra's individual case, Dr. Graddy opined that "Gamarra has a mental condition that responds to medication." Id. at 16. For these reasons, the government argues that "[a]t this stage, no reasonable option exists other than to medicate the defendant." Id.

In his opposition, Gamarra notes that the government "produced no evidence that the Bureau of Prisons made any attempt to restore Mr. Gamarra's competency other than by medication." Def.'s Opp'n at 14. Gamarra cites several instances in which the government's witnesses explained that other treatments, including therapy, were not recommended for Gamarra. See id. at 15–16.

The Court finds persuasive the detailed expert testimony from Dr. Du Bois, Laxton, and Dr. Graddy indicating that antipsychotic medication is likely to restore Gamarra's competency and that other less-intrusive treatments are not likely to work. And Gamarra failed to provide evidence either to rebut the government's evidence that medication was likely to be effective or to suggest that other treatments could be effective. For example, he does not challenge Dr. Du Bois and Laxton's observation that Gamarra's delusional beliefs persisted after attempts to challenge them and their conclusion that individual therapy was therefore unlikely to be effective. Indeed, all

evidence before this Court supports the government's position that antipsychotic medication is the only treatment likely to restore Gamarra to competency.

Accordingly, the Court finds that the government has met its burden to prove by clear and convincing evidence that involuntary medication is necessary to further its important interest in prosecuting Gamarra.

## IV.    INVOLUNTARY MEDICATION IS MEDICALLY APPROPRIATE

The fourth and final factor requires courts to find that "administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." Sell, 539 U.S. at 181. The Supreme Court noted in Sell that "[t]he specific kinds of drugs at issue may matter here as elsewhere," since "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." Id.

As to this final inquiry, the government cites Dr. Graddy's opinion that administration of antipsychotic medication was "clearly medically appropriate" in light of the fact that it is the course of treatment Dr. Graddy would recommend to someone in the community with the same condition as Gamarra and that such treatment has been prescribed "every time [Gamarra has] gone into a hospital." Gov't's Mot. at 16. Gamarra responds by arguing that "[i]n rendering his opinion in this case, . . . Dr. Graddy violated the ethical standards of the American Psychiatric Association" because he did not meet Gamarra in person before forming an opinion. Def.'s Opp'n at 17. Gamarra also challenges Dr. Graddy's opinion by noting that his diagnosis (schizophrenia, multiple episodes, currently in an active episode) differed both from the diagnosis of Dr. Du Bois and Laxton (schizophrenia, continuous) and Dr. Demisa at the Metropolitan Correctional Center during an earlier competency evaluation (schizoaffective disorder, bipolar type, continuous), and stating that this renders his opinion "suspect at best." Id. at 17–18. In its reply, the government

notes that the ethics rule that Gamarra cites applies only to "a psychiatrist opining about matters in the public domain, not to the ordinary practice of psychiatrists working with a practice team" and thus does not apply here. Gov't's Reply at 8 (emphasis removed).

Overall, the Court finds that Dr. Graddy's conclusion that involuntary medication is medically appropriate is persuasive, especially since the record demonstrates that Gamarra has been treated with antipsychotic medications, including risperidone, on several past occasions in a clinical setting and that these medications have significantly improved Gamarra's condition. The Court also finds relevant Dr. Graddy's opinions on the effectiveness of risperidone—both in general and as applied to Gamarra—which led Dr. Graddy to recommend its use notwithstanding the risk of side effects, including the possibility that Gamarra might experience stiffness or other neuromuscular symptoms. See 4/20/18 Hr'g Tr. at 43:1–12 (calling risperidone "one of our best medications"); 4/20/18 Hr'g Tr. at 36:19–41:3 (discussing Gamarra's past history of treatment with risperidone).

In addition, Gamarra's allegation that Dr. Graddy violated an ethical standard of his discipline in forming his opinions is unsupported. As the text of the cited ethics rule makes clear, it applies to occasions when "psychiatrists are asked for an opinion about an individual who is in the light of public attention or who has disclosed information about himself/herself through public media"—not, as here, where a psychiatrist is a patient's treating physician. Am. Psychiatric Ass'n, The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry 9 (2013), available at https://www.psychiatry.org/psychiatrists/practice/ethics. Furthermore, in response to the question of whether it was ethical for a psychiatrist to testify in a competency hearing "based . . . on medical records" where he or she "did not examine the defendant," the American Psychiatric Association's Ethics Committee responded "yes." Am. Psychiatric Ass'n, Opinions of the Ethics

Committee on The Principles of Medical Ethics 35 (2017), available at https://www.psychiatry.org/psychiatrists/practice/ethics. The Committee explained that "[i]t is common for forensic experts to offer opinions" based on review of records and without examining the defendant in person, and the rule was designed instead "to protect public figures from psychiatric speculation that harms the reputation of the profession of psychiatry and of the unsuspecting public figure." Id. Thus, Dr. Graddy's opinion does not violate the ethical standards of his profession.

Furthermore, the Court has no reason to conclude that the variations in Gamarra's diagnosis offered by Dr. Graddy, Dr. Du Bois and Laxton, and Dr. Dimisa alter the conclusion that antipsychotic medication, specifically risperidone, would be medically appropriate in treating Gamarra's condition. Dr. Graddy explained that these diagnoses were "not significantly different" and that any difference was "minor." See Forensic Add. and Treatment Plan at 2 n.2. Gamarra does not explain why these diagnostic differences should lead the Court to reject Dr. Graddy's medical opinion as to the medical appropriateness of treating Gamarra with antipsychotic medication. In any event, Dr. Graddy testified that "patients with schizophrenia or schizoaffective disorder . . . need medications to improve" because "[o]ther treatments are not very effective for these conditions," 4/13/18 Hr'g Tr. at 118:16–24, which suggests that either diagnosis would lead to the same conclusion that administration of antipsychotic medication would be medically appropriate.

Hence, the Court concludes that the government has proven by clear and convincing evidence that treatment with antipsychotic medication is in Gamarra's best interest given his condition, and thus is medically appropriate in this case.

21

## CONCLUSION

For the foregoing reasons, the Court concludes that the government has met its burden of proof with respect to each of the four <u>Sell</u> factors. Accordingly, the Court will order that Gamarra be involuntarily medicated to restore his competency.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated: October 19, 2018