UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 17-65 (JDB)** |
| | : | |
| **Jean-Paul Gamarra,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES MEMORANDUM AND
PROFFER IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion to have the defendant, Jean-Paul Gamarra (hereinafter "defendant"), detained pending trial. On April 4, 2017, the defendant was indicted with one count of violating 18 U.S.C. § 871 (threats against the President) and one count of violating 844(e) (threatening and conveying false information concerning use of an explosive). At the defendant's initial appearance before this Court, the government requested that the defendant be detained because he charged with a crime of violence and because there is a serious risk that he will flee. *See* 18 U.S.C. §§ 3142(f)(1)(A) and (f)(2)(A). For the reasons detailed below, the government continues to request that the defendant continue to be detained pending trial under 18 U.S.C. §§ 3142(f)(1)(A) and (f)(2)(A).

**Factual Proffer of the Evidence Supporting the Detention**

On March 28, 2017, at approximately 10:17 a.m., the defendant approached United States Secret Service ("USSS") law enforcement, who were armed, at 1500 Pennsylvania Avenue, N.W., Washington, D.C., near the Treasury Department Building and the White House Complex, and advised that he had a nuclear bomb detonator or defuser. The defendant was asked if he had a

bomb with him, and the defendant said no, he had a component to launch a nuclear weapon. The defendant said he was not there to harm President Trump. Law enforcement directed the defendant to place the package he was carrying on the ground. The package was a U.S. Postal Service Priority Mail Envelope that included on its cover the following (all spellings as they appear in the original): "Warning 100% threat Brand New Electronic Detonator Device president Secrete Servisce Explosive technology Department" and the statement "Warning this is a ~~tre~~ threat on the President and Senator life Secure Keyboard to be Reversed Engineereed." The outer package included the label "Blue tooth Bomb Explosion Component."

In reaction to the defendant's actions, various parts of a several square block area were closed to pedestrian and vehicular traffic, including the north fence line of the White House and its grounds, Lafayette Park, half of the Ellipse, the south fence line, and 15th Street from New York Avenue to F Street. For more than 90 minutes, no one was permitted to use the north entrance of the Department of Treasury Building. No one was permitted to enter or exit the Department of Treasury Annex Building or the Bank of America Building, located north of Pennsylvania Avenue, or the SunTrust bank building, located diagonally from the Department of Treasury Building. These closures affected interstate commerce. At approximately 11:57 a.m., the item in the bag, a Bluetooth keyboard, was rendered safe, and the streets and parks were reopened. A note included with the keyboard included the statement (as written): "Warning this device is a threat on Senatar and President Life."

The defendant was read warnings consistent with *Miranda* and consented to an interview. The defendant stated he had walked to the White House to deliver a "nuclear bomb component," which he wanted the USSS to have to avert a bomb-related plot against the President. The defendant stated he intended to deliver the keyboard to the USSS to "reverse engineer" its

capabilities and keep the President safe. The defendant said he did not have any explosives and wished no harm on the President.

The March 28, 2017 incident was not the first encounter that Mr. Gamarra had with the USSS. On February 13, 2014, the defendant walked into a Long Island, New York hospital and stated that he was going to kill President Barack Obama. After being transferred for a psychiatric evaluation, the defendant reaffirmed his intent to kill President Obama. The defendant stated he made the threat to gain attention from federal authorities.

Furthermore, on January 30, 2015, the Secret Service interviewed the defendant because he appeared to be acting suspiciously near Lafayette Park. The defendant stated he could not sleep and claimed to be merely walking around. He then admitted to being part of a group that wanted to impeach the President in a diplomatic way.

As a result of the March 28, 2017 incident, the defendant was arrested and charged by Complaint with Threats Against the President, in violation of 18 U.S.C. § 871, which carries a maximum penalty of five years of incarceration, and Threatening and Conveying False Information Concerning the Use of an Explosive, in violation of 18 U.S.C. 844(e), which carries a maximum penalty of 10 years of incarceration. On March 29, 2017, the government made a motion for a forensic screening and for temporary detention, pursuant to 18 U.S.C. § 3142(f)(1)(A) (crime of violence). The motion was granted, and the parties agreed to hold a detention hearing and a status hearing regarding defendant's competency on April 4, 2017. On April 3, 2017, Dr. Teresa Grant conducted a preliminary competency screening examination for the D.C. Department of Behavioral Health and found the defendant incompetent.

On April 4, 2017, a grand jury indicted the defendant on the same charges as alleged in the Complaint. Magistrate Judge Deborah A. Robinson then held an evidentiary hearing, during

which time testimony was elicited by both the government and defense counsel that the defendant had claimed to USSS officers that he did not intend to threaten the President.  Magistrate Judge Robinson then found that the government had established probable cause for the offenses.  The government requested that the defendant be committed to the Attorney General for a full 30-day psychological examination in order to assess whether the defendant was presently suffering from a mental disease or defect rendering him mentally incompetent.  Magistrate Judge Robinson permitted the commitment for placement in a suitable Bureau of Prisons ("BOP") facility for a period not to exceed thirty days.  (ECF No. 5).  The defendant was then transferred to the Medical Correctional Center ("MCC"), New York, New York, for further screening, on April 24, 2017.

On July 17, 2017, having reviewed the MCC Competency to Stand Trial Evaluation prepared by Dr. DiMisa ("MCC Report"), Magistrate Judge Robinson granted the motion by the Government to commit the defendant for placement in a suitable facility for 120 days to determine whether there was a substantial probability that he would in the foreseeable future attain the capacity to permit the proceedings to go forward.  (ECF No. 8).

As described in the Court's Memorandum Opinion of April 6, 2018, *see United States v. Gamarra*, 308 F.Supp.3d 230, 232 (D.D.C. 2018), the defendant was transferred to FMC Butner on September 19, 2017, but there were delays in returning the defendant to this jurisdiction. Medical staff at FMC Butner determined by report dated February 9, 2018, that the defendant was not competent, and recommended involuntary medication.  During a March 8, 2018 hearing, the government requested a hearing to determine whether Gamarra could be involuntarily medicated to restore his competency pursuant to *Sell v. United States*, 539 U.S. 166 (2003).  After litigation over whether the government had met the requisite *Sell* factors, on October 19, 2018, the Court

granted the government's Motion for Medical Treatment, which authorized FMC Butner medical staff to involuntarily medicate the defendant in order to treat his mental condition for the purpose of rendering him competent to stand trial.   ECF No. 36.   The Court further ordered FMC Butner to submit 30 day reports concerning treatment and recommendations concerning further treatment. *Id*.   The Court on October 31, 2018, granted the defendant's motion to stay execution of the order granting authority of FMC Butner to treat the defendant pending the defendant's appeal of the order.   Minute Order of October 31, 2018.   Proceedings were stayed pending the appeal to the D.C. Circuit (and subsequently to the Supreme Court).   On October 4, 2019, the D.C. Circuit affirmed the Court's order, *see United States v. Gamarra*, 940 F.3d 1315 (D.C. Cir. 2019), and on November 27, 2019, issued its Mandate.   The Court on December 3, 2019, lifted the stay on the order to BOP and, on December 6, 2019, issued a modified order committing the defendant to the custody of the Attorney General and authorizing the BOP to involuntarily medicate the defendant to treat his mental condition for the purpose of rendering him competent to stand trial.   ECF No. 53.   To the government's knowledge, the defendant was housed at the D.C. Jail, untreated, between April 2018 and February 2020.

Approximately two months later, the defendant began treatment at FMC Butner on February 5, 2020.   Memorandum of Logan Graddy, February 28, 2020.   Dr. Graddy, the treating physician, observed that the defendant "exhibited behavior and beliefs that demonstrated that he continued to have symptoms of mental illness."   *Id.* at 1.   Dr. Graddy prescribed a "relatively low dose" of the defendant's requested antipsychotic, Quetiapine (also known as Seroquel).   The defendant missed some doses.   On February 27, 2020, the defendant's dosage was increased because he remained incompetent at the lower dosage.

On May 13, 2020, Dr. Graddy provided an updated memorandum.   Memorandum of

Logan Grady, May 13, 2020.  This memorandum clarified that the defendant was provided Quetiapine at the higher dosage for approximately two and a half months.  Dr. Graddy noted that while this mediation was helpful for the defendant's mood and psychotic symptoms, the defendant had not yet regained competency.  The treatment team altered the defendant's medication plan to include Haldol lactate, despite the defendant's wishes.  This appears to be the first use of involuntary medication to treat the defendant's mental illness.  Afterwards, the defendant expressed that he experienced some side effects, but stated that he could think more clearly.  The defendant agreed to continue on Haldol, and use of Quetiapine was suspended.  Dr. Graddy also indicated that the defendant would start Benadryl to help with potential side effects.  Dr. Graddy concluded that "things were moving in a positive direction."

On May 21, 2020, Dr. Dubois, the defendant's treating psychologist, stated in an interim status report that, after the Haldol treatment, the defendant was less guarded and defensive regarding his statements, and that he had a factual understanding of his case and the legal process, though his rational understanding and his ability to assist counsel remain unclear. Interim Status Report, attached as Exhibit A, at 1.  Further, due to the emergence of the Covid-19 pandemic, FMC Butner instituted a lockdown, and group interventions were shut down, potentially impacting the defendant's treatment.  Nevertheless, according to Dr. Dubois, "the prognosis for Mr. Gamarra is good."  *Id*. at 2.  Dr. Dubois further reported that the defendant had reported an improved ability to concentrate while on Haldol, and that it was likely, though not certain, that "with an additional 60 days of treatment from the end of his current evaluation period, he will be restored to competency."  Interim Status Report at 2.

On June, 15, 2020, Dr. Graddy submitted his report regarding Mr. Gamarra's competency. In that report, Dr. Graddy indicated it was his opinion that Mr. Gamarra's "mental condition

(schizophrenia) continues to render him not competent to proceed to trial." Forensic Evaluation, dated June 6, 2020, at 9. However, given Mr. Gamarra's improvement, Dr. Graddy found that the prognosis for Mr. Gamarra is fair to good… and that there is a substantial probability his competency can be restored in the foreseeable future, with an additional period of treatment from the end of his current evaluation period." *Id.* at 9-10. While a determination was pending regarding whether an additional period of restoration was appropriate, Dr. Graddy submitted a follow-up report to the Court, dated July 28, 2020, that stated that he believes the defendant is now competent. Letter from Dr. Graddy, dated July 28, 2020, at 1. This court scheduled a combined competency hearing and detention hearing for August 20, 2020. Minute Order, dated August 11, 2020.

## **Principles Governing Requests for Detention**

The Bail Reform Act lists four factors that guide a court's pre-trial detention decision: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the person, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. See 18 U.S.C. § 3142(g). At a detention hearing, the government may present evidence by way of a proffer. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996). A judicial determination that a defendant should be detained pending trial on the ground of community safety must be supported by clear and convincing evidence. *Smith*, 79 F.3d at 1209. When the government seeks to detain a defendant on the ground that he is a risk of flight pursuant to 18 U.S.C. § 3142 (f)(2)(A), the government must demonstrate the defendant's flight risk by a preponderance of the evidence. *United States v. Xulam,* 84 F.3d 441, 442 (D.C. Cir. 1996).

1. **Nature and Circumstances of the Offense Charged**

The nature and circumstances of the offenses charged in this case support detention. Here, the defendant is charged with two crimes which, under 18 U.S.C. § 16(a), constitute a "crime of violence," as both charges have as an element of the crime, "the use, attempted use, or threatened use of physical force against the person or property of another." *See* 18 U.S.C. § 16(a); *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (identifying the necessary element).

Here, the defendant's crime was a threat involving the defendant showing up at the White House with a package that he claimed had a component to launch a nuclear weapon. Furthermore, the package included on its cover the following admonitions (all spellings as they appear in the original): "Warning 100% threat Brand New Electronic Detonator Device president Secrete Servisce Explosive technology Department" and the statement "Warning this is a ~~tre~~ threat on the President and Senator life Secure Keyboard to be Reversed Engineereed." The outer package included the label "Blue tooth Bomb Explosion Component."

Consideration of the nature and circumstances of the offense also requires the Court to weigh the possible penalty the defendant faces upon conviction. See *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990). Indeed, the seriousness of the defendant's crime is reflected in the sentence he would face if convicted. Here, the defendant faces not more than five years in prison for the charge of threats against the President, in violation of 18 U.S.C. § 871, and not more than ten years of imprisonment for the charge of threatening and conveying false information concerning the use of an explosive, in violation of 18 U.S.C. 844(e).

2. **The Weight of Evidence Against the Defendant**

The weight of the evidence against the defendant is substantial and supports detention. The defendant approached a Secret Service Uniformed Division Officer near the Treasury

Department Building and the White House Complex with a package and advised the officer that he had a nuclear bomb detonator or defuser. Furthermore, the labelling inside and outside of the package contained clear threats, as outlined above, including to the life of the President. The defendant's statements further corroborate the weight of the evidence.

### 3. The History and Characteristics of the Defendant

The defendant's history and characteristics also support pretrial detention. The defendant has no apparent ties to the District of Columbia. Prior to defendant's arrest, he had no fixed address. This morning, defense counsel for the first time provided the government with information regarding where the defendant may live once released—with his former wife and children. Pretrial Services will need to determine whether that location is a suitable place for the defendant to live and/or whether the defendant will receive courtesy supervision from another jurisdiction if the proposed residence is outside of Washington, D.C. Furthermore, while defense counsel has indicated that Mr. Gamarra's ex-wife is willing to be a third party custodian, he has not be able to confirm with Pretrial Services whether the defendant's ex-wife is eligible to be a third-party custodian. Without an acceptable and verified location for the defendant to reside or a proposed supervision plan, the Court has no way of ensuring that the defendant will be present at future proceedings in this case. In addition, prior to his arrest, the defendant was unemployed. As of the filing of this memorandum, the government is not aware of whether the defendant will be able to get employment if released and/or how he will support himself should he be released on his own personal recognizance.

Additionally, the defendant's mental health may pose a difficulty with him adhering to court orders. As of the filing of this memorandum, defense counsel has not provided the government with any proposed plan for where or how the defendant will receive mental health

treatment, to include his required medications, if released.  The defendant has long standing mental health issues and has been incompetent to stand trial for over three years.   The defendant's mental health is highly dependent on him being able and willing to take his medication.   However, the defendant has a long history of non-compliance with taking his medication.   Not only has the government had to seek an order to forcibly medicate the defendant, but multiple family members have indicated that prior to his arrest he was non-compliant with his medication and when he was non-compliant with his medication he became unstable.   Furthermore, this court has no assurances that if the defendant is released he will remain competent unless he continues to take his medication.   Without a solid release plan in place, this Court has no way of ensuring that the defendant will comply with any conditions of release set, particularly complying with his medication regime, or that he will be present for any future proceedings.

### 4. The Nature and Seriousness of the Danger to Any Person or the Community

Based on the Pretrial Services report, it appears that the defendant only has one prior conviction for criminal possession of marijuana.   However, he does have a history of interactions with the USSS prior to his arrest in 2017 and has made threats against another USSS protectee, former President Barack Obama.   Furthermore, the potential for such violent behavior cannot be discounted given his history of non-compliance with medication and reports from his family members that when the defendant is non-compliant with his medications he becomes unstable. Given that he has already engaged in unlawful conduct, there is a strong likelihood that his failure to comply with taking his medication could lead to him to engage in other such irrational acts, some of which could be potentially dangerous.

Taken together, such actions and behavior unequivocally underscore the government's position that the defendant should be detained pending trial particularly in light of the fact that there is not a solid proposed release plan.

### **Conclusion**

Based on the nature of the charges, the weight of the proffered evidence against the defendant, the defendant's mental health, and his risk of flight, it is evident that at this stage in the proceedings no condition or combination of conditions will reasonably assure the appearance of defendant at trial or the safety of any other person or the community.

Under the factors set forth in 18 U.S.C. § 3142(g), the government has demonstrated by a preponderance of the evidence that he should be detained as a serious risk of flight. For the foregoing reasons, as well as those that will be set forth at a hearing on this matter, the government requests that the Court order the pre-trial detention of the defendant.

Respectfully submitted,

Michael R. Sherwin
Acting United States Attorney
New York Bar No. 4444188

By: /s/ Nicole Hutchinson
NICOLE S. HUTCHINSON
California Bar No. 281524
Special Assistant U.S. Attorney
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
Nicole.Hutchinson@usdoj.gov
(202) 803-1670